## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**RANDALL FURMAN, et al.,**

        **Plaintiffs,**                        **Case No. 2:06-cv-784**
                                                  **JUDGE GREGORY L. FROST**
     **v.**                                **Magistrate Judge Mark R. Abel**

**DAIMLERCHRYSLER CORP.,**

        **Defendant.**

### OPINION AND ORDER

This matter is before the Court for consideration of a motion for summary judgment (Doc. # 48) filed by Defendant, DaimlerChrysler Corporation, a memorandum in opposition (Doc. # 60) filed by Plaintiff, Semco, Incorporated, and a reply memorandum (Doc. # 68) filed by DaimlerChrysler Corporation.  For the reasons that follow, this Court finds the motion for summary judgment not well taken.

### I.  Background

Plaintiff, Semco, Incorporated ("Semco"), is an Ohio corporation that manufactures beryllium copper plunger tips and other products used within the aluminum die cast industry. Since 1981, Semco has sold products to Defendant, DaimlerChrysler Corporation ("Chrysler"), and in 1993 Semco became Chrysler's chief supplier of beryllium copper plunger tips for a Chrysler casting plant located in Kokomo, Indiana.  Semco had obtained a blanket order number, also referenced in the record as a vendor number, which meant that the company could receive mass purchases by Chrysler instead of being required to use individual purchase orders.

This business relationship did not last.  In 2003, Semco's Vice President of Sales,

Randall Furman ("Furman"), became the company's primary sales representative on the

Chrysler/Kokomo account.  Furman's duties included calling on David Holder ("Holder"), the

Chrysler employee responsible for evaluating suppliers' products and making recommendations

on whether Chrysler would purchase them.

Randall Furman is Jewish, and Holder is an evangelical Christian.  This subject came up

during a September 2003 dinner at a trade show when, according to Furman, Holder encouraged

him to see the movie "The Passion of the Christ," told him that his interpretation of passages in

the Torah were incorrect, and told him that Furman, his wife, and his kids were going to Hell.

Randall Furman also contends that when Holder learned that Furman was raising his two

adopted children in the Jewish faith, although they were not born from a Jewish mother, Holder

became upset.  According to Furman, Holder again said that the entire family was going to Hell

and Holder invited Furman and his family to do missionary work in Guatemala.   Furman asserts

that Holder mentioned religion every time the two men would see one another and would

encourage Furman to teach his children Christianity.  In fact, Furman contends, Holder told

Furman during a June 2004 lunch that if Furman converted to Christianity, "everything in [his]

life would be okay."  (Furman Dep. at 130-31.)

In 2004, Chrysler began to increase its purchase of plunger tips from Castool Tooling

Solutions ("Castool"), a Semco competitor.  On August 12 of that year, Semco's Robert Diersing

and Furman obtained a meeting with Chrysler's Timm Fair, Holder's boss.  During this meeting,

Furman informed Fair that he believed Holder was anti-Semitic and that Semco was not

receiving fair treatment in its business relationship with Chrysler.  Specifically, Furman stated

that Chrysler was not listening to Semco's recommendations, but was listening to

recommendations from Castool.  After Fair purportedly indicated that he would look into the allegation, Furman and Diersing left his office and went to schedule a meeting with the Kokomo plant manager, Ken Moore, because, according to Furman, "[i]t just didn't seem like we were getting anywhere with Timm Fair."  (Furman Dep. at 171.)

The meeting with Moore took place on August 24, 2004 and also included individuals who were part of Chrysler's Kokomo management: Dee Clymer, Shawn Glass, Andre Wofford, and Fair.  Semco had requested that Holder not be present at this meeting, but Holder attended the late August meeting.

There is a factual dispute about much of what was said at this meeting.  Furman asserts that he again accused Holder of anti-Semitism and that he denied an allegation that he had once rummaged through Holder's desk when he was alone in the office.  According to Furman, Holder proceeded to state at this meeting that he would take away Semco's vendor number for blanket purchases, that "[w]e're not going to do business with you and your family" (Furman Dep. at 170), and that Furman was not sufficiently technically qualified to service Chrysler's account.  Furman asserts that Diersing told the Chrysler individuals that Semco could manufacture the same type of bayonet-style tip that they were purchasing from Castool.  Holder and numerous other Chrysler personnel dispute this account of the events and deny that Holder threatened to cease doing business with Randall Furman and his family.  Semco's sales to Chrysler continued to decline after this meeting, and Chrysler revoked Semco's blanket order number on September 21, 2005.  Semco currently does no business with Chrysler's Kokomo facility.

On August 24, 2006, Semco filed suit against Chrysler in the Franklin County Common

3

Pleas Court. (Docs. # 2-2, 3.) The Complaint asserts a single claim under 42 U.S.C. § 1981 for discrimination based on race, ethnicity, and religion. (Docs. # 2-2, 3.) Prior to filing an answer, Chrysler removed the action to this Court. (Doc. # 2.) On September 9, 2007, Chrysler then filed a motion for summary judgment. (Doc. # 48.) The parties have completed briefing, and the summary judgment motion is ripe for disposition.

## II. Summary Judgment Motion

### A. Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence

4

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.' "[1]  *Hamad*, 328 F.3d at 234-35 (quoting

*Anderson*, 477 U.S. at 251-52).

### B. Analysis

As noted, Semco asserts a claim under 42 U.S.C. § 1981.  That statute provides:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a).  The United States Supreme Court has explained that "[a]lthough § 1981

does not itself use the word "race," . . . the section . . . forbid[s] all 'racial' discrimination in the

making of private as well as public contracts."  *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604,

609 (1987).  Thus, § 1981 "protect[s] from discrimination identifiable classes of persons who are

subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."

*Id.* at 613.  Additionally, according to the statute, "[f]or purposes of this section, the term 'make

and enforce contracts' includes the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship."  42 U.S.C. § 1981(b).

Semco contends that although the Sixth Circuit has not offered an exact recitation of the

elements applicable to the type of § 1981 claim advanced here, the requirements of a prima facie

---

[1]  Chrysler attacks much of the evidence upon which Semco relies on the grounds that it
has not been properly authenticated.  This contention is in error for the evidence cited in this
Opinion and Order.

case can be found in *Baseball at Trotwood, LLC v. Dayton Professional Baseball Club*, No. C-3-98-260, 2003 WL 25566103 (S.D. Ohio Sept. 2, 2003). In that case, another judicial officer in this District described the elements as follows:

> (1) that at least one of the individual Plaintiffs who was integrally involved in the subject contract or business negotiations was a member of a protected class; (2) that they sought to enter into a contract or business relationship with another party who in all other respects was willing and able to perform under the terms of the contract or business proposal; (3) that they had the wherewithal, from an objective perspective, to perform under the terms of the contract or business proposal; and (4) that they were either offered, by a Defendant, the contract or business proposal under less favorable terms than had been, or would be, offered to other parties outside the protected class, or were denied the right to enter into or enjoy the benefits or privileges of same, while objectively similarly situated persons outside the protected class were not so denied.

*Id.* at *9 (footnote omitted). The Sixth Circuit has noted the problematic nature of meeting the "similarly situated" prong of the test, however, and has stated

> In a § 1981 commercial establishment case, a plaintiff must prove:
>
> (1) plaintiff is a member of a protected class;
>
> (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
>
> (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.
>
> The test's advantages are many. First, it best accounts for the differences in circumstances between employment and commercial establishment claims. The test offers the most traditional method of proving discrimination, namely by demonstrating discriminatory treatment with respect to similarly situated persons. It also allows a plaintiff to state a claim when similarly situated persons are not available for comparison, as will often be the case in the commercial establishment context.

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872-73 (6th Cir. 2001). The parties' debate focuses on only limited aspects of a prima facie case: whether Semco has alleged a type of

discrimination actionable under § 1981, whether Semco has set forth any direct or circumstantial evidence of discrimination, and whether Semco presents a causal nexus between the discrimination and the decisonmaking about which it complains.

Chrysler first argues that Semco has failed to present a § 1981 case because its claim is not predicated on race, but solely on religious discrimination.  In fact, Chrysler asserts that "Semco cannot . . . identify any evidence to suggest that any alleged discrimination occurred 'solely because of' the genetic ethnicity, racial ancestry or racial characteristics of Semco's owner."  (Doc. # 48-2, at 16.)  Semco of course disagrees with this characterization of its case.  The plaintiff company argues that determining distinctions between actions based on race and those based on religious discrimination is often difficult, that "it is clear that both are implicated" here, and that such nuanced sorting "would be an unwise use of judicial resources."  (Doc. # 60, at 25.)

Semco's first contention is generally correct, its second contention will be addressed below, and its third contention is without merit.  The undersigned judicial officer gets paid to analyze cases, however nuanced or difficult they may be.  This analysis leads the Court to conclude that summary judgment is not warranted on these specific grounds based on Furman's deposition testimony that Holder said, "We're not going to do business with you and your family." (Furman Dep. at 170.)  The statement begs the question of *why*, and a factfinder might draw the inference that the answer is because Leonard Furman, Semco's owner and Randall Furman's father, is Jewish.  Or the factfinder might conclude instead that the answer is because Randall Furman is part of Semco and a *practicing* Jew, which means that the why is not racial but religious discrimination.  Another inference would be because Castool's products were

7

superior or more economical, or that Castool employees were easier to get along with than Semco's employees.  For the present purposes, what is the most likely reasonable inference does not matter.  Nor does it matter that Holder and other Chrysler employees expressly deny that Holder ever made such a statement.  This Court is not in the position of evaluating evidence or factfinding in the summary judgment context.  What matters here is simply that a genuine issue over a material fact exists and that, if Furman is correct, a factfinder could draw a reasonable inference of racial discrimination from Holder's purported statement.

What makes the inference of racial discrimination possible here is that, as Semco argues, there is no evidence that at the time Holder made his statement, he knew anything about the religious practices of those Furmans involved in Semco.  Diersing in fact testified that he thought that Holder had only met Leonard Furman in 2003 for a moment or two.  (Diersing Dep., vol. I, at 168.)

The Court therefore emphasizes that it is the "you and your family" comment that enables Semco to survive summary judgment on this narrow aspect of Chrysler's motion.  The bulk of Semco's evidentiary allegations–the "The Passion of the Christ" references, the Torah interpretation disagreement, the comments about raising children under Judaism, and other comments Chrysler references in its reply memorandum (Doc. # 68-4, at 11)–arguably speak to *religious* discrimination, not *racial* discrimination.[2]  For example, contrary to Semco's position, no reasonable factfinder could extract racial discrimination from a disagreement over the meaning of a theological text.  Admittedly, the distinction between racial versus religious

---

[2]  Counsel should not regard this statement as expressing any opinion on whether the cited evidence could be introduced at trial as circumstantial evidence of racial discrimination. That issue is not before the Court at this time.

discrimination is often slight and nuanced, but the Court must credit the distinction.  *See Saint Francis Coll.*, 481 U.S. at 613 ("If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, *or his religion*, he will have made out a case under § 1981." (emphasis added)).

It is worth noting at this juncture that Semco's witnesses often describe their case in terms of religious discrimination.  For example, Semco's Diersing described the purpose of the August 24, 2004 meeting with Kokomo management as follows: "Well, from our standpoint, the purpose of the meeting was to discuss our product, but we also did not want to have Dave Holder in attendance, and we wanted to review with [Chrysler/Kokomo] management his attitude about – to Randy Furman about *his religious beliefs*."  (Diersing Dep., vol. I, at 136 (emphasis added).)

It is also necessary to note Semco's arguably attenuated argument that its case presents racial discrimination because Chrysler, through Holder, acted in response to perceptions or stereotypes accompanying those of Jewish ancestry.  Semco notes that (1) Holder became upset when he learned that the birth mother of Randall Furman's adopted children was not Jewish, but that the children were going to be raised as Jewish; (2) Holder has accused Furman of looking at papers on Holder's desk; and (3) Holder stated that he suspected Semco of deliberately engineering its tips with shorter life spans than possible to increase profits.  The company presents the first point as evidence of Holder's concern for the religious fate of non-Jews more than Jews, while asserting that the latter points evince Holder's perception of Jews as "sneaky

and devious in their business practices."[3]  (Doc. # 60, at 22.)  Semco also points to the fact that

Holder treated those of different faiths who were not Jews better than he treated Randall Furman.

Based on arguably strained inferences, some of this may indeed aid in defeating summary

judgment as Semco asserts, but the Court need not and does not opine on any such effect here,

given that one possible "you and your family" inference saves Semco from summary judgment

on Chrysler's nature-of-the-discrimination argument.

        To continue to survive summary judgment, Semco must offer either direct or indirect,

meaning  circumstantial, evidence of discrimination to establish its § 1981 claim.  *See Ozier v.*

*RTM Enters. of Georgia, Inc.*, 229 F. App'x 371, 375 (6th Cir. 2007).  The Sixth Circuit Court of

Appeals has explained that " '[d]irect evidence is evidence that proves the existence of a fact

without requiring any inferences.' "  *Beery v. Associated Hygienic Prods., Inc.*, 243 F. App'x

129, 132 (6th Cir. 2007) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544,

548 (6th Cir. 2004)).  *See also Ozier*, 229 F. App'x at 376-77.  Semco insists that its case is

based on such direct evidence of discrimination.  Citing Holder's comments and conduct

discussed above, the company insists that there is direct evidence of racial animus before this

Court.

        The cited material plainly fails to constitute direct evidence.  This is because the evidence

on which Semco relies necessarily requires the drawing of an inference, sometimes meager and

_____

        [3]  In its reply memorandum, Chrysler reasonably questions the characterization Semco
gives to Holder's questioning the technical support vendors such as Semco provided.  (Doc. #
68-4, at 9-10.)  The Court need not devote much time to the issue, given that it is arguable that
Holder would perceive a lack of support as a devious business practice, thereby reviving
Semco's stereotype argument.  No matter which party is correct as to what Holder said, the end
result is the same: a claimed instance of stereotyping does not prove influential here because the
"you and your family" comment by itself defeats the argument for summary judgment.

sometimes quite large indeed, to reach the conclusion that racial discrimination exists here.  All of Holder's comments are equally susceptible–in some instances more than equally susceptible–of arising from religious as opposed to racial discrimination.  To accept one inference over the other at this stage would be to engage in simple speculation.  When pure speculation is required to infer that an alleged comment was racially motivated, the comment cannot be direct evidence of discrimination.  *Ozier*, 229 F. App'x at 375.

Claims brought under § 1981 are governed by the same framework applied to Title VII claims, which means that in the absence of direct evidence,  Semco must rely on indirect or circumstantial evidence to present a prima facie case.  *See Patterson v. McLean Credit Union,* 491 U.S. 164  (1989); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1094 (6th Cir. 1996).  There is no real dispute in the briefing as to most of the elements involved in Semco's claim.

As noted, at least one of Holder's purported comments could permit an inference of a discriminatory animus based on race.  The evidence indicates that Semco was owned by Jews and that the company was involved in a business relationship with Chrysler.  It is undisputed that Semco sought to continue that business relationship, but that Chrysler ultimately terminated the relationship.  What is disputed is whether Semco can demonstrate or create an issue of fact as to the cause of that failure–i.e., whether the company can connect race discrimination to the events that decreased and eventually terminated the business with Chrysler.

Chrysler argues that Semco cannot demonstrate the requisite casual nexus between any racial discrimination and the adverse actions that befell Semco.  The defendant company posits that Holder's asserted conduct is unconnected to the business developments over which Semco

11

complains. This is a common progression in such cases. After a plaintiff has established a prima

facie case in circumstantial evidence cases, this Court must then employ the familiar *McDonnell*

*Douglas* burden-shifting framework. *See Hagan v. Warner/Elektra/Atlantic Corp.*, 92 F. App'x

264, 267 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992));

*DeBoer*, 124 F. App'x at 391-92 (citing *Skrjanc*, 272 F.3d at 315); *Christian*, 252 F.3d at 868.

The Sixth Circuit Court of Appeals has explained the resulting inquiry:

> If a plaintiff demonstrates a *prima facie* case of . . . discrimination, the burden
> shifts to the defendant to produce a legitimate, non-discriminatory reason for the
> challenged . . . actions. *McDonnell Douglas,* 411 U.S. at 802; *see also Wexler v.*
> *White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir. 2003) (en banc)
> (applying *McDonnell Douglas* analysis to age discrimination claim); *Zambetti v.*
> *Cuyahoga Cmty. Coll.,* 314 F.3d 249, 255-56 (6th Cir. 2002) (applying
> *McDonnell Douglas* analysis to reverse race discrimination claim). The
> defendant need only produce a legitimate, non-discriminatory reason; it need not
> persuade the court that this reason actually motivated the . . . actions in question.
> *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S.Ct.
> 2097, 147 L.Ed.2d 105 (2000). Once the defendant meets its burden of producing
> a legitimate, non-discriminatory reason for its challenged actions, the burden
> shifts to the plaintiff to demonstrate that the asserted justification is mere pretext
> for discriminatory motives. *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603,
> 615 (6th Cir. 2003). The plaintiff may meet this burden by showing that the
> reason offered by the defendant for the challenged employment actions (1) has no
> basis in fact, (2) did not actually motivate the actions, or (3) was insufficient to
> warrant the actions. *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078,
> 1084 (6th Cir.1994). The burden of persuading the trier of fact that defendant's
> asserted justification is pretextual ultimately rests with the plaintiff. *Anthony v.*
> *BTR Auto. Sealing Sys., Inc.,* 339 F.3d 506, 515 (6th Cir.2003).

*Koval,* 86 F. App'x at 66 (footnote omitted). *See also DeBoer*, 124 F. App'x at 391-92;

*Christian*, 252 F.3d at 868. Applying this standard, this Court must conclude that Semco's §

1981 claim survives summary judgment.

Chrysler has offered a non-discriminatory reasons for the adverse business developments

Semco has sustained. Semco's case targets two basic business developments: a reduction by

12

Chrysler in purchasing Semco's six-inch plunger tips and the cancellation of Semco's blanket purchase order number, which is also referred to by witnesses as the vendor's number.  The Court shall address each allegation in turn.

In regard to the former circumstances of alleged discrimination, Chrysler notes that it continued to purchase Semco tips on the component side of its business well after it had stopped purchasing Semco's six-inch tips on the other, or case, side of the business.  Although he participated in testing and data accumulation involving the six-inch tips on the case side of the operations, Chrysler asserts, Holder worked primarily on the component side of Kokomo's operations.  Thus, Chrysler concludes, "[i]t defies logic to conclude that Holder would purposefully discriminate against Semco" on one side of the business but not the other side. (Doc. # 48-2, at 17.)

This rationale is closing argument, not a statement regarding undisputed facts entitling Chrysler to judgment as a matter of law.  It asks this Court to weigh or evaluate the evidence and ascertain probabilities, all the while neglecting that Holder and Chrysler could discriminate selectively, as opposed to engaging in across-the-board discrimination.  In other words, the fact that discrimination might not have been all encompassing, or was less than complete, does not invariably mean that discrimination did not exist.

Chrysler also points to evidence supporting the contention that Holder neither made nor had the authority to make any decision as to what quantity of six-inch tips Chrysler purchased from Semco for use in the case side Kokomo operations.  The proffered reason for the reduction is simply that other Chrysler decisionmakers preferred Castool's six-inch tips.

The same applicable analysis that resolves for summary judgment purposes the "tips"

issue also applies to the 2005 cancellation of Semco's blanket purchase number or vendor's number. Chrysler argues that Semco cannot show that Holder caused this action. Rather, Chrysler points to evidence that A.T. Kearney, Inc., a company hired by Chrysler in 2004 to manage its purchasing, cancelled in 2005 the numbers of hundreds of vendors (including Semco and Castool) as part of a neutral business decision. To support this theory, Chrysler directs this Court to the previously cited *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862.

In *Christian*, the Sixth Circuit addressed a factual scenario in which shoppers sued Wal-Mart for race discrimination under § 1981. The shoppers claimed that an employee's racial animus was behind an accusation of shoplifting, but Wal-Mart argued that a neutral decisionmaker who did not know the shoppers' race had ultimately made the decision to have the shoppers ejected from the store for stealing. The Sixth Circuit Court of Appeals examined whether the store employee's discriminatory animus could be imputed to the manager who made the decision about which the shoppers complained. Analogizing these facts to the type of case in which a plaintiff seeks to impute the discriminatory intent of a supervisor to a neutral decisiomaker, the court of appeals explained that "to complete a prima facie case under such circumstances, the plaintiff must offer evidence that the supervisor's racial animus was the cause of the termination or somehow influenced the ultimate decisionmaker." *Id.* at 877 (citing *Wilson v. Stroh Cos., Inc.*, 952 F.2d 942, 946 (6th Cir. 1992)).

Chrysler argues that Semco cannot demonstrate this causal nexus between Holder's alleged discriminatory animus and any Chrysler or A.T. Kearney decisionmaking. The court of appeals also explained in *Christian*, however, that an individual's discriminatory animus can color the ultimate decisionmaker's decision by setting a plaintiff up to fail, such as by portraying

14

that individual in the worst possible light to the decisionmaker.  *Id.*  If prejudice influenced the information presented to the decisionmaker, the decision can be tainted and racial animus can be imputed.  *Id.* at 878.  The determinative question is thus whether Semco has submitted evidence that Holder's racial animus was a cause of Chrysler's or A.T. Kearney's decisionmaking.  *See id.*

Chrysler directs this Court to evidence supporting a history of purchasing from Castool that predates Holder's interactions with Randall Furman, in addition to evidence by Chrysler employees who assert that it was their decision to use six-inch Castool tips.  Further, the declaration of A.T. Kearney's Hilary Steinway attests that both Semco and Castool were invited to submit proposals for supplying various products, but that Semco's proposal addressed only a limited number of products, in contrast to Castool's proposal that addressed all 53 products.  (Doc. # 69-3, Steinway Decl. ¶ 7.)  Citing the stated objective of A.T. Kearney's mission to reduce the number of suppliers, Steinway asserts that she decided to eliminate Semco because it was not willing to provide a sufficient number of products.  (Doc. # 69-3, Steinway Decl. ¶ 8.)  Steinway denies that her decision was based on anything else, and she states that she has "never known the religious affiliation or racial identity of anyone affiliated with Semco, Inc."  (Doc. # 69-3, Steinway Decl. ¶¶ 10, 12.)

Semco contests Chrysler's argument by pointing to other evidence, such as deposition testimony indicating that Holder's duties included data collection and analysis.  Most importantly, however, Semco has offered copies of e-mails that on their face indicate that Holder was involved in ordering tips, both prior to and after the involvement of A.T. Kearney.

In an August 25, 2004 e-mail to a Castool contact, for example, Holder references the prior day's meeting with Semco and states that "[t]he new setup for the bullet face tips are 53-

800-3193 drawing number 80093-01.  I told Noel Wood to issue an order for 30 ASAP.  You

probably received an order for only two, that was a mistake it should have been 30." (Doc. # 63-

2, at 1.)  Another exhibit confirms this order.  In an e-mail from Holder to Noel Wood sent

earlier on August 25, 2004, Holder writes in relevant part:

> I noticed you only ordered (2) 53-800-3193 bullet face shot tips.  Currently
> Castool has been sending both the sharp nose and the bullet nose in on the 53-
> 800-3095 number.  I would like to have you order 30 bullet face ASAP as to not
> confuse production anymore.  I have contacted Castool and told them to send the
> 53-800-3095 with a sharp nose from now on and the 53-800-3193 with the bullet
> nose only from now on.

(Doc. # 64-12, at 1.)  Holder ends his email as follows:

> P.S.
>
> I wish you could have been in the meeting with SEMCO yesterday, Randy is a
> real piece of work.

(Doc. # 64-12, at 1.)  This e-mail certainly introduces a genuine issue of material fact as to

whether Holder was involved in the purchasing of tips.  It also presents a statement concerning

Randall Furman that would potentially permit a factfinder to draw an inference as to Holder's

opinion of the Semco employee.

Semco has also produced an April 23, 2005 e-mail from Holder to Wood that states in

relevant part:

> It appears that we are looking to change our usage on the 53-800-3145 Semco
> shot tip.  We currently have the minimum set to 40 and order 50.  Let's change
> this to minimum of 10, then order 15.  The test we were running with the Castool
> 3 3/4" tip indicates that we are going to switch to it for now.

(Doc. # 63, at 39.)  Any reasonable factfinder could conclude that this e-mail is evidence that

Holder was involved in directing purchases from Semco.

Similarly, in a May 2, 2005 e-mail from Holder to the same Castool employee involved above, Holder states:

> Last week I had a nice long talk with our new A.T. Kearney buyer Jennifer Benone and Hilary.Steinway. [*sic*] Both Andre and I told them that we were happy with our current suppliers and **DO NOT** want them to go shopping for the cheapest price at the cost of our plant. She sent a list of different code groups and the list of the current suppliers and ask[ed] us to identify which vendors should supply each product. I identified Castool as one of our primary 53 code group suppliers and listed all of the current tooling that you are supplying to stay with you unless we tell them different.

(Doc. # 63-2, at 2.) This communication also presents a genuine issue of material fact over the autonomy of the A.T. Kearney decisionmaking, with Holder's e-mail obviously contradicting his purported non-involvement.

The Court is not permitted to weigh the credibility of the evidence involved. *Christian*, 252 F.3d at 879. Rather, necessarily viewing the evidence in a light most favorable to Semco, this Court must conclude that a reasonable jury could find by inference that (1) Holder did play a role in purchasing decisions and in selecting what type or brand of tips were used, as well as in A.T. Kearney's decisionmaking, (2) Holder's role was influenced by racial animus, and (3) the stated reason for the business developments of which Semco complains therefore had no basis in fact. *See id.* The issues are for the jury, given that Semco has presented factual issues surrounding its prima facie case and the issue of pretext.

Having found that genuine issues of material fact exist, the Court need not and does not discuss each remaining piece of evidence that the parties present. Regardless of the additional supporting content of this evidence–such as that evidence calling into question the accuracy of Holder's data, or cumulative evidence asserting that Chrysler management was removed from purchasing decisions–the foregoing exhibits and testimony present contrary evidence, creating

17

factual issues that cannot be resolved at this stage.  The Court also need not discuss in any extended detail Semco's assertion that prior explanations for its loss of business that Chrysler suggested and then allegedly abandoned during discovery point to the pretextual nature of Chrysler's current explanations.

This leaves the issues of punitive damages and the scope of Semco's Complaint.  In regard to punitive damages, Chrysler moves for summary judgment on the grounds that, as a matter of law, insufficient evidence exists to entitle Semco to punitive damages.  The crux of Chrysler's fairly unexplained rationale is that the company made reasonable business decisions in selecting Castool's six-inch tip over Semco's tips.  This argument overlooks the fact that Semco complains about more than just the selection of one tip over another.  Chrysler's arguably conclusory argument also focuses on its purported investigation into racial discrimination, but it does not address other evidence that it disregarded potential race discrimination; nor does Chrysler present a substantive analysis of Semco's case against the defendant company.  In other words, Chrysler does not argue how, necessarily resolving all inferences in Semco's favor for purposes of summary judgment analysis, there is not potentially enough here to support punitive damages.  In contrast, Semco presents an argument that Holder, whose actions a factfinder could find under these circumstances constituted managerial acts, and Kokomo upper management willfully engaged in or tolerated race discrimination.  Punitive damages therefore must remain available to Semco at this time.

In regard to the scope of Semco's case, the parties disagree whether Semco has asserted–and whether it can assert–a claim for retaliation under § 1981.  Chrysler did not initially move for summary judgment on a retaliation claim, but Semco then asserted in its memorandum

18

in opposition that it was asserting both race discrimination and retaliation.  Semco correctly anticipated that Chrysler would argue that the Complaint fails to adequately raise a claim of retaliation.  (Doc. # 60, at 30 n.7.)  Chrysler directs this Court to the Complaint itself and cases standing for the proposition that a party cannot defeat summary judgment by suddenly injecting a new claim into a case.

The Complaint need only provide notice of its claim or claims, and no magic words are required.  Semco's pleading states at the outset that "[t]his is an action for monetary damages resulting from the defendant's discriminatory refusal to continue contracting and doing business with the plaintiffs because of their race, ethnicity and religion in violation of Title 42 U.S.C. § 1981."  (Doc. # 3 ¶ 1.)  This statement of the nature of the case does not include retaliation; there is no indication that the *because of* includes Semco's report of race discrimination to Chrysler.  Although the factual allegations set forth in the pleading might have presented a reporting-and-retaliation scenario, what matters is what claim or claims Semco actually brought on those facts, not what claim or claims it could have elected to assert.  Neither the initial statement of the nature of the case nor the subsequent statement of the claim for relief indicate an intent to assert a claim for retaliation.  Therefore, assuming without deciding that a retaliation claim is possible in the § 1981 commercial litigation context, the Court must conclude that Semco has not asserted such a claim.  The plaintiff company's pleading does not provide Chrysler fair notice of Semco's actual pursuit of a merely potential claim.  The issue of whether a retaliation claim could survive summary judgment is therefore moot.

19

### III.  Conclusion

For the foregoing reasons, the Court **DENIES** Chrysler's motion for summary judgment.

(Doc. # 48.)

      **IT IS SO ORDERED**.

                                            _____/s/ Gregory L. Frost_____
                                            GREGORY L. FROST
                                            UNITED STATES DISTRICT JUDGE